**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**EASTERN DIVISION**

**LASHONDA COX** **PLAINTIFF**

**v.** **CIVIL ACTION NO. 2:23-cv-84-TBM-RPM**

**JERRY W. COX** **DEFENDANT**

# MEMORANDUM OPINION AND ORDER

Aaron and LaShonda Cox were married and resided in Louisiana. Shortly after the two married, Aaron took out a $500,000 life insurance policy from Protective Life Insurance on his own life. Aaron was named as the Policy's owner, LaShonda was the Policy's primary beneficiary, and the couple paid for the Policy's premiums until they separated in 2016. LaShonda then moved to Mississippi and filed for divorce a few years later, in part because Aaron had been a habitual drug user and was in and out of the penitentiary.

Aaron, then represented by an attorney, moved to dismiss that divorce complaint, contending that the Mississippi Chancery Court lacked personal jurisdiction over him. A few days before that motion was granted, Aaron changed the primary beneficiary of the Policy from LaShonda to his father, Jerry Cox, who had assumed paying the Policy's premiums in 2016. LaShonda later filed an amended complaint adequately alleging the Chancery Court's personal jurisdiction over Aaron, but soon thereafter, Aaron's attorney died and Aaron's participation in the divorce proceedings abruptly ceased. The Chancery Court entered a Final Judgment of Divorce via a default judgment because of Aaron's lack of participation in the case for about a year and since he did not appear at the divorce trial. The Final Judgment said Aaron should name

LaShonda "as the owner and beneficiary" of that Policy or a different insurance policy in the same amount. But Jerry remained the Policy's primary beneficiary at the time of Aaron's death. Shortly after that default judgment was entered, the Chancery Court received a letter from Jerry saying that Aaron could not participate in the divorce trial because he was imprisoned in a Louisiana jail.

Aaron then passed away unexpectedly about a year and a half later. LaShonda and Jerry then separately contacted Protective Life Insurance under the belief that they were both rightfully entitled to the Policy's proceeds. LaShonda relies on the Full Faith and Credit Act, 28 U.S.C. § 1738, arguing that the Final Judgment of Divorce overrides any contractual rights Jerry had under the Policy. Jerry relies on the four-corners of the Policy, and the fact that he remained the named primary beneficiary at the time of Aaron's death. Protective then filed an interpleader action in this Court because it could not determine who was rightfully entitled to the Policy's proceeds. Now both have filed competing Motions for Summary Judgment, asserting each is rightfully entitled to the Policy's proceeds.

The Final Judgment of Divorce has no preclusive effect in this action but informs the Court's conclusion that Mississippi law applies to LaShonda's claims. Regardless of what substantive law is applied though, LaShonda's Uniform Fraudulent Transfer Act ("UFTA") claim fails because LaShonda is not a "creditor" and Aaron is not a "debtor" under the Act where Aaron was not subject to any valid judgment by the Chancery Court when the change of beneficiaries was made. LaShonda also cannot point to an applicable "transfer" here because a "transfer" requires an "asset" and LaShonda's role as primary beneficiary of the Policy at the time the change was made does not meet, or is otherwise exempt from, the Act's definition of an "asset."

The same is true for LaShonda's constructive trust claim; even if Mississippi law applies, the claim still fails. While a handful of cases have found that a constructive trust was appropriate when a divorce judgment instructs a party not to change life insurance beneficiaries—and that party does so *after* that judgment is entered—this situation is different. LaShonda presents no authority showing that a constructive trust is appropriate (i) when the life insurance beneficiary was changed *before* any divorce judgment was entered barring that change, (ii) where the divorce court found it lacked personal jurisdiction over that party at the time the change was made, or (iii) where there is ample evidence that the relevant party was in jail at the time the judgment was entered.

Beyond her own conjecture, LaShonda offers no evidence of Aaron's supposed ill-intent in changing the Policy's beneficiaries. Far short of that, there is no direct evidence that Aaron—or Jerry—knew about the terms of the Final Judgment of Divorce before Aaron died. As LaShonda alleges, Aaron was in and out of jail and was a habitual drug user. While it is possible Aaron knew about the Final Judgment of Divorce, it is equally possible he did not. Any conclusion otherwise would be speculation on the Court's behalf. No genuine issue of material fact exists.

Jerry Cox's Motion for Summary Judgment [102] is granted, and LaShonda Cox's Motion for Summary Judgment [100] is denied.

## I. BACKGROUND AND PROCEDURAL HISTORY

In June 2002, Protective Life Insurance issued a life insurance policy that insured the life of Aaron Cox in the face amount of $500,000. Aaron, the insured, was designated as the Policy's owner, and his wife, LaShonda Cox was named as the primary beneficiary. [104], ¶¶ 1, 2; [113], ¶¶

1-3. Aaron's father, Jerry Cox, was named as the contingent beneficiary. [104], ¶ 2. Because the parties lived in Louisiana, the Policy was delivered to and issued in Louisiana. *Id.* at ¶ 3.

In July 2016, LaShonda and Aaron separated, and LaShonda moved to Mississippi. *See* [103-5], p. 3. LaShonda was aware the Policy was still in effect after the couple separated, and she also knew that Jerry had begun paying the Policy's premiums. [103-5], p. 8:9-21. Three years later, on October 16, 2019, LaShonda filed for divorce against Aaron in the Chancery Court of the Second Judicial District of Jasper County, Mississippi. [32], ¶ 5; [36], ¶ 4. Among other grounds for divorce, LaShonda alleges that Aaron "ha[d] been sentenced to the penitentiary," and "habitual[ly] and excessive[ly] use[d] opium, morphine or other like drug[s]." [38-3], ¶¶ 6-7. LaShonda's complaint also noted Aaron "let[ ] his business go and the only real serious business he now indulges in is the habitual and excessive use of" those drugs. *Id.* at ¶ 7. Aaron was served with the summons and complaint for divorce on October 20, 2019. [32], ¶ 6; [36], ¶ 5. That complaint requested various forms of relief but never mentioned the Policy. [38-3]; [107], p. 3.

Aaron, then represented by counsel Jonathan Michael Farris, moved to dismiss LaShonda's complaint for lack of personal jurisdiction. [103-8]. While that motion was pending, Aaron submitted a change of beneficiary form to Protective on December 5, 2019, naming Jerry as the primary beneficiary. [38-5]. Aaron named his mother, Brenda Cox, as the contingent beneficiary. [104], ¶ 4; [113], ¶ 4. Aaron's motion to dismiss was ultimately granted on December 12, 2019. [103-9]. The Chancery Court found that LaShonda's complaint "must be dismissed, but only insofar as it seeks *in personam* relief against" Aaron. [103-9], p. 3. The Court later granted leave for LaShonda to file an amended complaint, again stating it had found that LaShonda's complaint "was to be dismissed only insofar as it seeks *in personam* relief against" Aaron, but that

the court "retained jurisdiction over the cause of action for grounds of divorce." [38-7], ¶ 4. LaShonda filed her amended complaint on January 22, 2020, which asserted Aaron's connections to Mississippi. [38-8]. The complaint reiterated LaShonda's allegations that Aaron was a drug addict and has been sentenced to the penitentiary but still did not mention the Policy. [38-8], ¶¶ 6-7.

Mr. Farris later died in June 2020.[1] [118-4], p. 1. Counsel for LaShonda issued various notices to Mr. Farris before and after his death related to a motion to compel Aaron's responses to outstanding discovery. [38-9] (May 7, 2020); [38-10] (June 22, 2020); [38-11] (August 12, 2020). On August 29, 2020, LaShonda sent a notice to Aaron at his father's house. [38-12]. A few weeks later, LaShonda filed a motion recognizing Mr. Farris's death, and requesting that the Court compel Aaron to obtain the services of a lawyer or to proceed *pro se* on September 14, 2020. [38-13].

LaShonda issued a hearing notice to Aaron related to LaShonda's motions to compel, which was set for September 28, 2020. [38-14]. After the hearing, the Chancery Court granted both motions, issuing separate orders on October 2, 2020, compelling Aaron to respond to LaShonda's discovery requests and retain new counsel or indicate that he was proceeding *pro se*. [38-15]; [38-16]. Neither Aaron nor any attorney made an appearance on Aaron's behalf at the September 28, 2020, hearing. *Id.* LaShonda moved for trial setting on February 22, 2021 [38-17], and the Court set the "trial / (final hearing)" on May 5, 2021. [38-19]. Following that hearing, the Chancery Court issued a Final Judgment of Divorce the very next day. [32], ¶ 9; [36], ¶ 9. The Final

---

[1] STATE OF MISSISSIPPI JUDICIARY, ADMINISTRATIVE OFFICE OF COURTS, *Bar Memorial Service held at Mississippi Supreme Court*, https://courts.ms.gov/news/2020/10.13.20Bar%20Memorial%20afterstory.php (Oct. 13, 2020). The Court only provides the following information for context and does not take judicial notice of Mr. Ferris's death as an adjudicative fact pursuant to FED. R. EVID. 201.

Judgment of Divorce observed that Aaron was "not [ ] present, nor represented by counsel." [38-21], p. 1. The Court received a letter from Jerry shortly after the Final Judgment was entered, explaining that Aaron could not attend the divorce trial because he "was in rehab for almost 3 months, and has been incarcerated in [a Louisiana] jail since leaving rehab." [38-18].

The Final Judgment of Divorce speaks about the Policy in two places. Paragraph 17 explains that Aaron "has a $500,000 life insurance policy which has been issued by and through his insurance agent, Mitch Welch." [38-21], ¶ 17. According to LaShonda, Mitch Welch was the insurance agent that sold Aaron the Protective Policy. [103], p. 15. The Final Judgment continues that "[LaShonda] shall be named as the owner and beneficiary of said policy, and [Aaron] shall be required to keep said life insurance policy in full force and effect upon his life." [38-21], ¶ 17. "If [Aaron] has allowed said insurance policy to lapse," the Final Judgment explains that "he shall immediately obtain other life insurance coverage of the same like and coverage in an amount of $500,000." *Id.* It also stated "[LaShonda] shall be named as the owner and sole beneficiary of said policy." *Id.* Paragraph 20 of the Final Judgment reads slightly different, explaining in relevant part "that [Aaron] is hereby required to procure a life insurance policy through his insurance agent Mitch Welch, in the amount of $500,000, and that [LaShonda] shall be named as the owner and beneficiary of said policy[.]" *Id.* at ¶ 20.

Jerry remained the primary beneficiary on the Policy after the Final Judgment of Divorce was entered, and at the time that Aaron unexpectedly passed away in December 2022. After Aaron's death, Jerry contacted Protective to file a claim for the Policy's death benefit. [104], ¶ 6; [113], ¶ 6. Protective provided Jerry with the forms necessary to proceed with the claim. *Id.* That same month, LaShonda's attorney sent a letter to Protective and provided notice of the Final

Judgment of Divorce. [1], ¶ 12. Specifically, the letter said that "LaShonda Cox[ ] is the court ordered beneficiary of the life insurance policy. Therefore, any monies payable by and through the life insurance policy is to be paid unto [LaShonda]." *Id.* Protective provided LaShonda with the required forms to make a claim for the Policy's death benefit. *Id.* at ¶ 13. Neither party completed the necessary forms. [1], ¶ 15.

As a result of LaShonda and Jerry's requests, Protective filed an interpleader action in this Court in June 2023. *See* [1]. Protective said that it could not "determine without peril the proper party to whom the Policy's death benefit is payable." *Id.* at ¶ 17. On November 2, 2023, this Court issued an Order [20] finding interpleader was proper, and Protective subsequently deposited the $500,000 death benefit proceeds of the Policy into the Registry of the Court. Protective was then dismissed from this action. *See* [29].

On November 28, 2023, Jerry moved the Chancery Court for leave to file an amended petition and to open an estate in Louisiana for Aaron. [118-5]. Then, Tammy Sue Cox Hickman, Aaron's sister and administratrix of his estate, filed an amended petition to set aside the Final Judgment of Divorce. [101-2]. On February 5, 2024, the Chancery Court issued an order dismissing Hickman's amended petition. [118-7]; [118], p. 2. No evidence suggests this judgment has since been appealed.

LaShonda and Jerry have since filed competing complaints in this Court, each asserting they were entitled to the Policy's proceeds. [32]; [33]. LaShonda "demands judgment against . . . Jerry . . . and that she be declared the lawful and rightful beneficiary of the interpled life insurance benefits and that . . . Jerry . . . receive nothing." [32], p. 6. Jerry asks the Court for similar relief,

alleging that he "is the rightful beneficiary under the Protective Life Policy" and asking that the Court award him "the full sum of $500,000 under the . . . Policy[.]" [33], p. 7.

Both now move for summary judgment. *See* [100]; [102].[2] LaShonda, relying on Mississippi law, moves for summary judgment under a theory that the change in beneficiaries violated Mississippi's UFTA, MISS. CODE ANN. § 15-3-101 *et. seq.*, or otherwise created of a constructive trust in her favor. [100], pps. 3-4; [101], pps. 8-10. Jerry, relying on Louisiana law, argues he is entitled to the Policy's proceeds because he is the designated primary beneficiary. *See* [103], p. 7.

## II. STANDARD OF REVIEW

Summary judgment is warranted when the evidence reveals no genuine issue on any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324; *see also Johnson v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, 90 F.4th 449, 460 (5th Cir. 2024) ("[A] party opposing a properly supported summary judgment

---

[2] The parties previously cross-moved for Summary Judgment after conducting no discovery. *See* [38]; [40]. The Court denied both motions as premature and entered a new scheduling order. *See* [53].

motion 'may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial.'" (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)). "When ruling on a motion for summary judgment, 'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the [nonmoving party].'" *Ragas*, 136 F.3d at 458 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

Additionally, in reviewing "cross-motions for summary judgment, [the Court] examine[s] 'each party's motion independently' and view[s] the evidence and inferences in the light most favorable to the nonmoving party.'" *Springboards To Educ., Inc. v. Hous. Indep. Sch. Dist.*, 912 F.3d 805, 811 (5th Cir. 2019) (quoting *JP Morgan Chase Bank, N.A. v. DataTreasury Corp.*, 823 F.3d 1006, 1011 (5th Cir. 2016)). "Cross-motions for summary judgment will not, in and of themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *Joplin v. Bias*, 631 F.2d 1235, 1237 (5th Cir. 1980). The rationale for this rule is that "each party moving for summary judgment may do so on different legal theories depending on different constellations of material facts." *Bricklayers, Masons & Plasterers Int'l Union of Am., Loc. Union No. 15, Orlando, Fla. v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975). That said, "cross-motions for summary judgment may be probative of the non-existence of a factual dispute when [ ] they demonstrate a basic agreement concerning what legal theories and material facts are dispositive." *Petro Harvester Operating Co. v. Keith*, 954 F.3d 686, 700 (5th Cir. 2020) (quoting *Bricklayers*, 512 F.2d at 1023).

The parties previously requested a bench trial instead of a jury trial. In cases where the judge acts as a finder of fact, the standard at summary judgment changes slightly. As the Fifth Circuit explained recently in *Fleming v. Bayou Steel BD Holdings II L.L.C.*, 83 F.4th 278 (5th Cir. 2023):

> Ordinarily, credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences are jury functions, not those of a judge. But in a bench trial, the judge acts as trier of fact in place of the jury. In view of that, the district court has somewhat greater discretion to consider what weight it will accord the evidence when considering summary judgment. Specifically, even at the summary judgment stage a judge in a bench trial has the limited discretion to decide that the same evidence, presented to him or her as trier of fact in a plenary trial, could not possibly lead to a different result. And the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though decision may depend on inferences to be drawn from what has been incontrovertibly proved.

*Id.* at 293–94 (citations, alterations and quotation marks omitted).

## III. DISCUSSION

It is undisputed that Jerry is named as the Policy's primary beneficiary. That change of beneficiary occurred a year and a half before entry of the Final Judgment of Divorce, and it also happened before the Chancery Court had personal jurisdiction over Aaron. *See* [38-21]; [103-9], p. 3; [104], ¶¶ 4, 8; [113], ¶¶ 4, 8. Also, the Final Judgment of Divorce was entered by default after Aaron did not appear for the divorce trial because he was in jail at the time and in rehab before that. [38-18].

But at issue is whether the Final Judgment of Divorce alters who is entitled to the Policy's proceeds. If LaShonda can show that a constructive trust was created in her favor, or that the UFTA was violated when Aaron changed the Policy's beneficiary to Jerry, then she will be entitled

to the Policy's proceeds. If she cannot do so, then Jerry is rightfully entitled to the proceeds as the primary beneficiary to the Policy.

**A. The Full Faith and Credit Clause**

LaShonda relies heavily on the Full Faith and Credit Act, 28 U.S.C. § 1738, stating that "this court is precluded from relitigating the issues in the underlying state court divorce action[.]" [100], p. 3. Pointing to the Final Judgment of Divorce, LaShonda argues this Court should award her the life insurance proceeds. *Id.* The Court has no intention of relitigating the proceedings before the Chancery Court but explores the preclusive effect of the Final Judgment of Divorce.

"The Full Faith and Credit Act, 28 U.S.C. § 1738, requires federal courts as well as state courts to give state judicial proceedings 'the same full faith and credit . . . as they have by law or usage in the courts of such State . . . from which they are taken." *Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 519, 106 S. Ct. 768, 769, 88 L. Ed. 2d 877 (1986). "Federal courts may not 'employ their own rules . . . in determining the effect of state judgments,' but must 'accept the rules chosen by the State from which the judgment is taken.'" *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 373, 116 S. Ct. 873, 877, 134 L. Ed. 2d 6 (1996) (quoting *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 481-482, 102 S. Ct. 1883, 1898, 72 L.Ed.2d 262 (1982)). But "the Full Faith and Credit Clause, in either its constitutional or statutory incarnations, does not give rise to an implied federal cause of action." *Thompson v. Thompson*, 484 U.S. 174, 182, 108 S. Ct. 513, 98 L.Ed.2d 512 (1988) (citing *Minnesota v. N. Sec. Co.*, 194 U.S. 48, 72, 24 S. Ct. 598, 48 L. Ed. 870 (1904)). Rather, its purpose is "[t]o determine in a particular case whether a prior state court judgment is to be accorded preclusive effect in the later federal proceeding[.]" *Walker v. Kerr-McGee Chem. Corp.*, 793 F. Supp. 688, 693 (N.D. Miss. 1992).

LaShonda essentially argues that the Full Faith and Credit Act mandates that this Court recognize a divorce decree automatically overrides anything previously done pursuant to a contract. But she does not cite any law that actually says that. Instead, she merely cites some very general propositions that apply to the Full Faith and Credit Act. Her argument is not persuasive based on the facts of this case.

"[O]ne is not bound by a judgment [for a] litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Hansberry v. Lee*, 311 U.S. 32, 40, 61 S. Ct. 115, 117, 85 L. Ed. 22 (1940) (citing *Pennoyer v. Neff*, 95 U.S. 714, 24 L. Ed. 565 (1877)). Here, Jerry was not a party in the Chancery Court suit and was never served with process in the Chancery Court suit. Nor does it appear that Jerry falls under either of the six exceptions to the rule against nonparty preclusion. *See Taylor v. Sturgell*, 553 U.S. 880, 893-95, 128 S. Ct. 2161, 2172-73, 171 L. Ed. 2d 155 (2008). The Third Circuit summarized the six exceptions identified in *Taylor v. Sturgell*, describing them as when:

1) the nonparty agrees to be bound by the determination of issues in an action between others;

2) a substantive legal relationship—i.e. traditional privity—exists that binds the nonparty;

3) the nonparty was "adequately represented by someone with the same interests who [wa]s a party";

4) the nonparty assumes control over the litigation in which the judgment is rendered;

5) the nonparty attempts to bring suit as the designated representative of someone who was a party in the prior litigation; or when

6) the nonparty falls under a special statutory scheme that "expressly foreclos[es] successive litigation by nonlitigants."

*Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 312–13 (3d Cir. 2009) (citing *Taylor*, 553 U.S. at 893-95, 128 S. Ct. at 2172-73).

The Court finds none of these categories are applicable to Jerry. Jerry did not agree to be bound by the Chancery Court's actions in the divorce proceeding. Jerry does not fall under a special statutory scheme that forecloses his participation in the present action and Jerry did not bring this suit as the designated representative of Aaron.

Jerry did not assume control of his son's divorce proceedings either. The parties agree that Jerry sent a letter to the Chancery Court that was received after the Final Judgment of Divorce was entered, notifying it that Aaron had been in rehab, then subsequently incarcerated in Washington Parish, Louisiana, and would be unable to attend the hearing that ultimately resulted in a default judgment being entered against him. [38-18]. Neither party introduces evidence that Jerry appointed counsel to make an appearance on his son's behalf or that Jerry would otherwise be assuming control over his son's case.[3] *Id.* And while Jerry filed a petition in the Chancery Court to set aside the Final Judgment of Divorce after Aaron's death, Jerry had no legal right to maintain that suit, evidenced by Tammy Hickman, the administratrix of Aaron's estate, soon thereafter filing an amended petition and assuming control of those proceedings from that point forward. [101-2]; [118-4].

Nor was there a substantive legal relationship that bound Jerry to Aaron. Legal relationships such as "preceding and succeeding owners of property, bailee and bailor, and

[3] The letter was filed on May 14, 2021, *after* the Final Judgment of Divorce was entered. Mississippi State Courts use the "MEC system[, which] is based on the federal CM/ECF system developed by the Administrative Office of U.S. Courts[.]" STATE OF MISSISSIPPI JUDICIARY, ADMINISTRATIVE OFFICE OF COURTS, *General Information*, https://courts.ms.gov/mec/GeneralInformation.php (last accessed Sep. 22, 2026). Like CM/ECF, the MEC system populates a header on each page of a submitted document showing the date filed, as well as the docket number and page number for each page of the filed document.

assignee and assignor" justify preclusion. *Maxwell v. U.S. Bank Nat. Ass'n*, 544 F. App'x 470, 473 (5th Cir. 2013) (quoting *Taylor*, 553 U.S. at 894, 128 S. Ct. at 2172). While Aaron was alive, Jerry was not the owner of the Policy. Aaron was. Jerry was just the primary beneficiary. A revocable beneficiary designation is a mere expectancy of property—an inchoate, unexecuted gift that was revocable by Aaron at any moment before his death. *See Lamar Life Ins. Co. v. Moody*, 122 Miss. 99, 84 So. 135, 136 (1920) (finding original beneficiary had no vested right to policy's proceeds where insured exercised right to change beneficiaries); *Bank of Belzoni v. Hodges*, 132 Miss. 238, 96 So. 97, 98 (1923) ("[T]he beneficiary, where there is a change authorized to be made by the insured, has no vested interest in the policy."); *Faulkner v. Faulkner*, 192 Miss. 358, 5 So. 2d 421, 422 (1942) (holding original beneficiary of policy that allowed insured to change beneficiaries "had no vested rights but only an inchoate imperfect and ambulatory right prior to insured's death").

In sum, the Final Judgment of Divorce has no preclusive effect against Jerry in this action.

**B. Mississippi Law Controls**

The parties dispute which state's law applies to LaShonda's claims under the UFTA and for a constructive trust. The Policy does not contain a choice-of-law provision. *See* [101-1]. LaShonda briefs only Mississippi law, while Jerry briefs only Louisiana law. Neither party provides a conflict-of-laws analysis. The Court must do so now.

In diversity cases, courts apply the law of the forum state to determine which state's law applies. *See Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 258 (5th Cir. 2014). This principle, first articulated in the landmark case *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941), was extended to interpleader actions through a companion case decided on the same day, *Griffin v. McCoach*, 313 U.S. 498, 503, 61 S. Ct. 1023,

1025, 85 L. Ed. 1481 (1941). The forum state here is Mississippi, so the Court applies its conflict-of-laws provisions. "In Mississippi, [a conflict-of-laws] analysis arises only when there is a true conflict between the laws of two states, each having an interest in the litigation." *Williams v. Liberty Mut. Ins. Co.*, 741 F.3d 617, 620 (5th Cir. 2014).

Once a true conflict has been established,[4] Mississippi's conflict-of-laws test consists of three steps. The first step is to determine whether the laws at issue are substantive or procedural. *Id.* (citing *Ellis v. Trustmark Builders, Inc.*, 625 F.3d 222, 225 (5th Cir. 2010)). If they are procedural, the inquiry ends and Mississippi law applies. *Id.* (citing *Zurich Am. Ins. Co. v. Goodwin*, 920 So. 2d 427, 433 (Miss. 2006)). Second, if they are substantive, the Court must classify the laws as either tort, property, or contract. *Ellis*, 625 F.3d at 225-26. Third, the Court looks to the relevant sections of the Restatement (Second) of Conflict of Laws. *Id.* As to the third step, Mississippi resolves conflict-of-laws questions using the "significant relationship" test under § 6 of the Restatement (Second) of Conflict of Laws (1971). *Herring Gas Co. v. Magee*, 22 F.3d 603, 607-08 (5th Cir. 1994); *Mitchell v. Craft,* 211 So.2d 509, 516 (Miss. 1968) (adopting § 6). This is also known as the "center of gravity" test, under which the Court "must determine 'which state has the most substantial contacts with the parties and the subject matter of the action." *Williams*, 741 F.3d at 621.

The "center of gravity" test is informed by any contacts listed in applicable, more-specific provisions of the Restatement (Second) Conflict of Laws. *See, e.g., McDaniel v. Ritter*, 556 So. 2d 303, 310 (Miss. 1989) (applying contacts in § 145 of the Restatement (Second) Conflict of Laws),

[4] As explained below in more detail, Louisiana and Mississippi vary greatly on constructive trusts and UFTA claims. In fact, Louisiana does not recognize constructive trusts and has repealed its version of the UFTA. As a result, the Court must provide a conflict-of-laws analysis.

*Boardman v. United Servs. Auto. Ass'n*, 470 So. 2d 1024, 1035 (Miss. 1985) (applying contacts in § 188 of the Restatement (Second) Conflict of Laws). Federal courts replicating Mississippi's conflict-of-laws analysis examine the § 6 factors and those more specific contacts when deciding what substantive state law Mississippi courts would apply. *See Herring Gas Co.*, 22 F.3d at 607-08 (assuming *arguendo* Mississippi courts would apply § 187 of the Restatement (Second) Conflict of Laws); *Morris Schneider Wittstadt, LLC v. Beau Rivage Resorts, Inc.*, No. 1:15CV403-LG-RHW, 2016 WL 1254387, at *2 *(S.D. Miss. Mar. 29, 2016) (applying § 221 of the Restatement (Second) Conflict of Laws to constructive trust claim). That said, "[t]he principles of Sections 6 and [more specific provisions] of the Restatement (Second) defy mechanical application—they are less 'rules of law' than generally-stated guideposts." *McDaniel*, 556 So. 2d at 310.

Mississippi "appl[ies] the center of gravity test to each question presented, recognizing that the answer produced in some instances may be that [Mississippi law] applies and on other questions in the same case the substantive law of another state may be enforceable." *Boardman*, 470 So. 2d at 1031. "But [w]here [a foreign state's] law is contrary to the deeply ingrained and strongly felt public policy of this state," the Mississippi Supreme Court has recognized it "may nevertheless apply and enforce this state's positive substantive law." *Id.* at 1031 (citing *McNeal v. Administrator of Estate of McNeal,* 254 So.2d 521, 524 (Miss. 1971)); *McDaniel*, 556 So. 2d at 316. All Mississippi law is "by definition to express the public policy of the state[,]" but "some . . . laws reflect public policies which are more fundamental and more inviolable than others." *Boardman*, 470 So. 2d at 1038.

The Court separates its conflict-of-laws analysis into two questions: (i) what substantive state law governs LaShonda's request for the creation of a constructive trust, and (ii) what substantive state law governs LaShonda's UFTA claim?

**i. Constructive Trust**

Whether a constructive trust should be created is a substantive question. *See Zurich*, 920 So. 2d at 433 ("[F]ew laws are classified as procedural. In addition to the Mississippi Rules of Civil Procedure, and Rules of Evidence, we have only found the definition of 'procedural' to include statutes of limitations, award of attorney's fees and awards of prejudgment interest.") (internal citations omitted). Constructive trusts are equitable remedies that sound in quasi-contract. Restatement (Second) of Conflict of Laws 8 6 Intro. Note (1971) ("[Restitution] deals with law which is neither contract nor tort."). For example, courts have applied the contacts in § 221 when analyzing what substantive law governed a constructive trust claim. *Morris Schneider Wittstadt*, 2016 WL 1254387, at *2. Mirroring that approach, the Court analyzes § 6 through the contacts listed in § 221 of the Restatement (Second) of Conflict of Laws, which provides:

> (1) In actions for restitution, the rights and liabilities of the parties with respect to the particular issue are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
>
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> (a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship,
>
> (b) the place where the benefit or enrichment was received,
>
> (c) the place where the act conferring the benefit or enrichment was done,

> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>
> (e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 221.

The Court finds these contacts tend to indicate Louisiana law should control. The first contact, "[t]he place where a relationship between the parties was centered . . . is the contact that, as to most issues, is given the greatest weight[.]" *Id.*, cmt. d. Reading this contact as the relationship between the parties, Jerry and LaShonda, their relationship may be seen as centered in Louisiana. Jerry interacted with LaShonda in Louisiana while she was married to his son, evidenced at minimum by the financial support given to the couple by Jerry while they were married. *See* [103-3], [103-4]. But if construed as the *parties' relationship to this lawsuit*, the Court finds this contact is neither centered in Louisiana nor Mississippi. LaShonda's right to the funds stem from a judgment issued in Mississippi, while Jerry's claims to the funds stem from actions taken in Louisiana—where the Policy was issued and the change of beneficiary was executed.

Nevertheless, the Court gives little weight to this contact, considering the relationship between Jerry and LaShonda was not "substantially related to the receipt of enrichment[.]" *See* Restatement (Second) of Conflict of Laws § 221, cmt. d.

The second contact, the receipt of enrichment, "will usually be that of greatest importance with respect to most issues in situations where the claim to restitution does not stem from any relationship between the parties." Restatement (Second) of Conflict of Laws § 221 (1971), cmt. d.

The act conferring the benefit was received in Louisiana. Indeed, Jerry resided in Louisiana at the time of the change of beneficiary.

Next, Louisiana was where the act conferring the enrichment was done. Aaron changed the beneficiary from LaShonda to Jerry in October 2019 in Louisiana because both Aaron and Jerry resided in Louisiana when Jerry was named as the beneficiary.

As to the domiciles of the parties, this contact is neutral. LaShonda is domiciled in Mississippi and was also domiciled in Mississippi when the beneficiary was changed. But LaShonda was domiciled in Louisiana for a large portion of her marriage to Aaron. And Jerry has been domiciled in Louisiana.

And finally, the location of the property at issue. The funds currently exist in Mississippi, but the Court finds this contact is neutral because Protective was under court order to deposit those funds in the Court's repository. [20]. Once a dispute arose about the Policy's proceeds, Protective could have initiated this interpleader action in a Louisiana federal district court, and the judge presiding in that case could have ordered the funds be deposited in that court's repository.

Notwithstanding its finding that Louisiana has more contacts, the Court analyzes those contacts in the context of § 6,[5] and in light of Mississippi's exception that a foreign state's law may

---

[5] Section 6 of the Restatement (Second) of Conflicts of Laws lists several factors to be used by courts in making conflict-of-laws determinations:

a) the needs of the interstate and international systems;
b) the relevant policies of the forum;
c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;
d) the protection of justified expectations;
e) the basic policies underlying the particular field of law;
f) certainty, predictability, and uniformity of result; and
g) ease in determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2) (1971).

still be overridden by Mississippi law when it is contrary to the deeply ingrained and strongly felt public policy of Mississippi. *See Boardman*, 470 So. 2d at 1031. For the following reasons, application of Louisiana law would offend the public policy of Mississippi to enforce constructive trusts.

The Court's analysis of § 6 indicates that Mississippi has a direct and substantial interest in this litigation. Given Mississippi Courts treat those factors as "guideposts" the Court need not belabor its analysis by going through every factor, particularly where many of the factors overlap in their subject matter. *E.g., compare* Restatement (Second) of Conflict of Laws § 6(2)(b) *with* Restatement (Second) of Conflict of Laws § 6(2)(e). But at minimum, the needs of the interstate systems weigh in favor of applying Mississippi law. "Interstate or international systems are advanced by each jurisdiction having easily ascertainable, certain, uniform, and predictable law governing disputes in that jurisdiction." *Mayo v. Hartford Life Ins. Co.*, 220 F. Supp. 2d 714, 744 (S.D. Tex. 2002), *remanded on other grounds*, 354 F.3d 400 (5th Cir. 2004). Here, a Mississippi Chancery Court entered the Final Judgment of Divorce, which imposed alimony and child support on the decedent, Aaron. [38-21]. Those proceedings played out exactly as they were supposed to under Mississippi law: Aaron was properly served, defaulted, and the Final Judgment of Divorce was entered, requiring Aaron to maintain a life insurance policy that named LaShonda as the owner and beneficiary of said policy. [103], p. 15.

Now Aaron may have never known about the Final Judgment, especially any provision related to the Policy. At the time he changed the Policy's beneficiaries, Aaron had already moved to dismiss the divorce complaint for lack of personal jurisdiction over him. [103-8]. And the Chancery Court granted that motion just days later. [103-9]. At that time the change was made,

LaShonda also had not yet put forward any argument in the divorce proceedings that she was entitled to a judgment mandating her be designated the Policy's primary beneficiary. [107], p. 3.

However, the Chancery Court's Judgment continued to be valid at the time of his death, and while his divorce proceeding was pending, Aaron changed the beneficiary of the policy from LaShonda to Jerry. Regardless of Aaron's motivation(s), the effect of that transfer is that a Mississippi domiciliary prevailed in Mississippi court by way of default judgment but cannot enforce the judgment if Louisiana law is applied. *See Zaveri v. Condor Petroleum Corp.*, 27 F. Supp. 3d 695, 707 (W.D. La. 2014) ("[I]t is clear that constructive trusts are not recognized under Louisiana law.") (collecting cases). Jerry's "insistence that private contracting parties be able to impose on non-signatories [foreign] state law [ ], despite the impact of that law on other state's citizens, undermines the uniformity of [Mississippi] law, thereby interfering with goal of promotion of ease of determination and application of the law to be applied." *Mayo*, 220 F. Supp. 2d at 744; *see Mitchell*, 211 So. 2d at 514 ("This state is especially concerned with the protection of its injured domiciliaries and their families[.]").

Applying Mississippi law also does not upset the settled expectations of the parties. LaShonda and Jerry have no preexisting contractual relationship with one another. LaShonda's claim for a constructive trust is restitution, and the Restatement provides that "the values of certainty, predictability and uniformity of result are of less importance in at least some areas of restitution than in the field of contracts where the parties and their lawyers can be expected to give advance thought to the legal consequences of their transactions." Restatement (Second) of Conflict of Laws § 221 (1971), cmt. b. "Indeed, it can be said that the purpose of restitution is to

do justice to the parties after an event whose occurrence one of the parties, at least, will usually not have foreseen." *Id.*

As for the relevant policies of other interested states, the Court's inquiry turns on why Louisiana does not recognize constructive trusts. Louisiana has a longstanding history of not recognizing constructive trusts. *See, e.g., In re Liquidation of Canal Bank & Tr. Co.*, 181 La. 856, 882, 160 So. 609, 617 (1935). That history stems from a critical distinction between civil and common law. Common law has historically recognized constructive trusts because the party who misappropriates funds "gets legal title when he uses the funds so entrusted to him to purchase other property[.]" *Succession of Onorato*, 219 La. 1, 26, 51 So. 2d 804, 812 (1951). The logic goes that the wrongdoer "holds the equitable title in trust" for the *rightful* owner of the funds. *Id.* By contrast, Louisiana's civil system finds the equitable remedy of a constructive trust is "the antithesis of the provisions of [the Louisiana Civil] Code dealing with privileges." *Id.*, at 36 (McCaleb, J., dissenting). The Supreme Court of Louisiana reasoned that, under civil law "doctrine," the wrongdoer "never gets any kind of title against the one from whom he steals, for, when he purchases with stolen funds, the title is in the one from whom he stole the funds." *Id.* at 26. Even so, the Louisiana Supreme Court recognized that, whatever the distinction between civil and common law with respect to constructive trusts, "the underlying principle of each [doctrine] is justice, equity, and fair dealing." *Id.* The Court finds that neither "justice" nor "equity" are served by imposing Louisiana law here. Louisiana's interest in *not* recognizing constructive trusts is longstanding, but Mississippi's public policy of recognizing them is equally storied, exemplified in the over 80 years of jurisprudence recognizing these equitable remedies. *See, e.g., Rimmer v. Austin*, 191 Miss. 664, 4 So. 2d 224, 225 (1941). Mississippi's constructive trust doctrine, as it has

evolved via common law and legislative guidance, is certainly the public policy of the state. And the state's "interest in seeing its policy correctly applied far overwhelms any other consideration." *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 404 (5th Cir. 2004); *see* MISS. CODE ANN. § 91-8-1001(b)(9) ("To remedy a breach of trust . . . the court may . . . impose a lien or a constructive trust on trust property, or trace trust property wrongfully disposed of and recover the property or its proceeds[.]").

Even if the § 6 factors did not weigh in favor of imposing Mississippi law for LaShonda's constructive trust claim,[6] Mississippi's public policy exception gives an independent reason for doing so. Mississippi Courts have "expressed [ ] reluctance to enforce the law of that state where such would be offensive to the deeply ingrained or strongly felt public policy of this state." *McDaniel*, 556 So. 2d at 316 (citing *Boardman,* 470 So.2d at 1038-39). "[A] state is not required to enforce a law obnoxious to its public policy[,]" and this Court finds that Mississippi courts would enforce Mississippi's longstanding policy of recognizing constructive trusts, over Louisiana's policy of not recognizing them. *Griffin*, 313 U.S. at 507, 61 S. Ct. at 1027; *see Mayo*, 220 F. Supp. 2d at 739.

In sum, the Court finds that Louisiana has more relevant contacts, but imposition of Louisiana law in this case would run contrary to the Restatement (Second) Conflict of Laws § 6 factors and Mississippi's longstanding public policy.

[6] Although the Fifth Circuit has recognized "decisions subsequent to *Mitchell* appear to have given little, if any, actual weight to the policy considerations in § 6[,]" it explained that Mississippi considers those "'factors enumerated in Restatement § 6 will from case to case be given such relative weight as they are entitled, consistent with the general scheme of the center of gravity test.'" *Allison v. ITE Imperial Corp.*, 928 F.2d 137, 141 (5th Cir. 1991) (quoting *Boardman*, 470 So. 2d at 1032).

**ii. Uniform Fraudulent Transfer Act**

Next, the Court must determine whether Louisiana or Mississippi law applies to LaShonda's UFTA claim.

First, whether any fraudulent transfer occurred is substantive in nature. *See id.* at 433. And claims for fraudulent transfer sound in tort. *See In re Mirant Corp.*, 675 F.3d 530, 537 (5th Cir. 2012) (applying tort conflict-of-laws principles to fraudulent transfer claim in bankruptcy). In tort matters, Mississippi has applied § 6 and § 145 of the Restatement (Second) Conflict of Laws. *See, e.g., Smith v. Church Mut. Ins. Co.*, 254 So. 3d 57, 71 (Miss. 2018) (discussing Mississippi's prior reliance on § 145). The contacts listed in § 145 include (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered. *Ellis*, 625 F.3d at 226; Restatement (Second) of Conflict of Laws § 145.

But "[i]n contrast with standard torts such as battery and negligence, fraudulent transfer actions present a unique challenge for courts engaging in a significant relationships analysis." *In re Palm Beach Fin. Partners, L.P.*, No. 09-36379-BKC-PGH, 2014 WL 12498025, at *9 (Bankr. S.D. Fla. Dec. 10, 2014). As the Fifth Circuit Court of Appeals has explained:

> "[T]he injury in [a fraudulent transfer action] is intangible. Not only does this make it very difficult to assign a meaningful location to the injury, the commentary to the Restatement suggests that when the injury is intangible the importance of this factor is severely diminished. *Cf.* Restatement (Second) of Conflict of Laws § 145 cmt. e (1971). Similarly, . . . it [is] nearly impossible to define what conduct caused the injury and the place where that conduct occurred. Here, it is not necessary to definitively identify or locate the relevant conduct because constructive fraudulent transfer laws are more concerned with helping injured parties than deterring conduct. *Cf.* Restatement (Second) of Conflict of Laws § 145 cmt. c (1971). Because the record indicates that there are relevant parties in [two states], this factor does

> not favor either state. Finally, there is no one location where the relationship of the parties is clearly centered, and this factor is not particularly relevant on these facts."

*In re Mirant Corp.*, 675 F.3d at 537. The Court borrows its earlier conclusion that the parties' relationship to this lawsuit is not centered in either Louisiana or Mississippi. Thus, "only one of the § 145(2) contacts—the domicile, residence, nationality, place of incorporation, and place of business of the parties—is particularly relevant to a [conflict-of-laws] analysis in the context of a fraudulent transfer action." *In re Palm Beach Fin. Partners*, 2014 WL 12498025, at *9. And that factor is minimally relevant given it points to neither Louisiana nor Mississippi; LaShonda resides in Mississippi and Jerry lives in Louisiana.[7]

The Court must also evaluate these tort-specific contacts in light of the general conflict-of-laws considerations contained in § 6. The same reasons articulated in the context of LaShonda's constructive trust claim help explain why Mississippi courts would likely apply Mississippi law to LaShonda's UFTA claims. Louisiana repealed its version of UFTA and therefore does not recognize UFTA claims. *See* Kenneth C. Kettering, *Codifying A Choice of Law Rule for Fraudulent Transfer: A Memorandum to the Uniform Law Commission*, 19 Am. Bank. Inst. L. Rev. 319, 320 n.1 (2011) (explaining that Louisiana repealed the Uniform Fraudulent Transfer Act in 2004); Edward D. Hughes, Jonathan A. Moore, Bethany Breaux Percle, *Uniform Fraudulent Transfer Act—No bulk sales law or Uniform Fraudulent Transfer Act*, 1 La. Prac. Corp. § 13:200 (2026 ed.) ("The Uniform Fraudulent Transfer Act, La. Rev. Stat. Ann. §§ 9:2790.1 through 9:2790.12, was repealed by Acts 2004, No. 447, § 2, effective June 24, 2004.").

---

[7] The Court would reach the same conclusion even if it were to consider the place "where the injury occurred" to mean where LaShonda suffered the injury, Mississippi. The Fifth Circuit has "emphasized that under Mississippi's conflict-of-laws rules, the law of the state where the injury occurs controls unless another state is shown to have a more significant relationship to the occurrence and parties." *Denman by Denman v. Snapper Div.*, 131 F.3d 546, 550 (5th Cir. 1998) (citing *Allison*, 928 F.2d at 141-142 & n. 4).

And like the above analysis, even if the § 6 factors did not weigh in favor of imposing Mississippi law, Mississippi's public policy exception gives an independent reason for doing so. Mississippi's UFTA is "by definition" the "express [ ] public policy of" Mississippi. *Boardman*, 470 So. 2d at 1038; MISS. CODE ANN. § 15-3-101 *et. seq*. Nor can the Court say that the Act, enacted by Mississippi's state legislature, is less "fundamental" and less "inviolable" than doctrines such as comparative negligence, a ruleset that Mississippi has consistently applied over other state's frameworks. *See Boardman*, 470 So. 2d at 1038; *McDaniel*, 556 So. 2d at 317. The Act, and its predecessors have a longstanding history in the state, derived from English common law. *Barbee v. Pigott*, 507 So. 2d 77, 84 (Miss. 1987) ("In 1848 this State enacted a statute virtually identical with the English statute 13 Eliz., ch. 5, which has since been recodified as MISS. CODE ANN. § 15–3–3."). Mississippi public policy of preventing fraudulent transfers predates even its recognition of constructive trusts, cementing it as the public policy of the state. *See, e.g., Vasser v. Henderson*, 40 Miss. 519, 521 (Miss. Err. & App. 1866); *Allen v. Montgomery*, 48 Miss. 101, 109-10 (1873). The Court finds that imposition of Louisiana law in this case would run contrary to the § 6 factors and Mississippi's longstanding public policy of recognizing UFTA claims.

**B. The Uniform Fraudulent Transfer Act**

LaShonda does not establish her UFTA claim under Mississippi law for the purpose of summary judgment. LaShonda relies on Mississippi's UFTA to establish that "Aaron's change of beneficiary was a fraudulent transfer." *See* [101], p. 11; MISS. CODE ANN. §§ 15-3-101 *et seq.* Mississippi's UFTA explains a "transfer made . . . by a debtor is fraudulent . . . if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor." *Id.* § 15-3-107(1). But as the Court explains, LaShonda is not a traditional "creditor" and Aaron is not a traditional "debtor" where Aaron was not subject to any valid judgment by the Chancery Court

when the change of beneficiaries was made. More importantly, LaShonda cannot point to an applicable "transfer" here because a "transfer" requires an "asset" and LaShonda's role as primary beneficiary of the Policy at the time the change was made does not meet, or is otherwise exempt from, the Act's definition of an "asset."

LaShonda is not a traditional "creditor," and Aaron is not a traditional "debtor" under Mississippi's UFTA. The Act defines a "creditor" as "a person who has a claim." *Id.* § 15-3-101(d). A "debtor" means "a person who is liable on a claim." *Id.* § 15-3-101(f). And a "claim" means "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 15-3-101(c). Neither party clearly fits those statutory definitions because Aaron was not "liable" to LaShonda for any "claim" when Aaron changed the Policy's beneficiaries. [38-7], ¶ 4; [103-9], p. 3. The Chancery Court lacked personal jurisdiction over Aaron at the time the change was made, so no "claim" existed when Aaron merely exercised his rights as owner of the Policy to change the Policy's beneficiaries. [101-1], p. 10 ("The Owner may change the Owner or any Beneficiary during the Insured's lifetime."); *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 110, 89 S. Ct. 1562, 1569, 23 L. Ed. 2d 129 (1969) ("[A] court has no power to adjudicate a personal claim or obligation unless it has jurisdiction over the person of the defendant."); *see Roberts v. Roberts*, 866 So. 2d 474, 477 (Miss. Ct. App. 2003) ("If the court is without jurisdiction—subject matter or personal—no one is bound by anything the court may say regarding the (de)merits of the case.") (citing *Petters v. Petters,* 560 So. 2d 722, 723 (Miss.1990)).

Moreover, Aaron never made an applicable "transfer" under Mississippi's UFTA. A "transfer" means "every mode, direct or indirect, absolute or conditional, voluntary or

involuntary, of disposing of or parting with an *asset* or an *interest in an asset[.]" Id.* § 15-3-101(l) (emphasis added). The change of beneficiary cannot be considered a "transfer" under Mississippi's UFTA because a "transfer" necessarily requires an "asset." *See also Equitable Life Assur. Soc. of U.S. v. Hitchcock*, 258 N.W. 214, 217 (Mich. 1935) ("[T]he change of beneficiary executed by the insured while insolvent did not constitute a conveyance of property in fraud of creditors within the meaning of the fraudulent conveyance act."); *First Wisconsin Nat. Bank of Milwaukee v. Roehling*, 269 N.W. 677, 680 (Wis. 1936) ("[N]o inference can be drawn . . . that a mere change of beneficiary upon a policy having no cash surrender value is a transfer capable of being fraudulent."). The Policy's proceeds are not considered an "asset" for two reasons.

First, LaShonda's then-status as the Policy's primary beneficiary did not give her a property interest in the Policy's proceeds and is therefore not an "asset." The term "asset" is defined as the "property of a debtor," that is, "anything that may be the subject of ownership." *Id.* § 15-3-101(j). But when Aaron changed the Policy's beneficiary to Jerry, LaShonda had no property interest in the Policy's proceeds, but only a *mere expectancy* that a property interest in the proceeds would vest if she remained the primary beneficiary of the Policy at the time of Aaron's death. *See* 44A Am. Jur. 2d Insurance § 1665 ("Where the policy reserves the right to the insured the right to change the beneficiary, the beneficiary has only an expectancy in the proceeds of the policy, and the insured may generally change the beneficiary when desired and without the beneficiary's consent."); *see, e.g., Lamar Life Insurance*, 122 Miss. at 84, So. at 136; *Bank of Belzoni*, 96 So. at 98; *Faulkner*, 5 So. 2d at 422. The Final Judgment of Divorce does not change the Court's analysis because it had not been entered when that change occurred. *See Furtsch v. O'Dell*, 2025 WL 586551, at *5 (Tenn. Ct. App. Feb. 24, 2025) ("The husband was under no duty by law or

contract to have life insurance in the first place or to designate the defendant as the beneficiary of it[.]").

Second, even if LaShonda's expectation of the Policy's proceeds were considered a property interest, life insurance proceeds like those at issue here, are explicitly exempt from being considered an "asset" under Mississippi's UFTA. The Act explains an "'Asset' means property of a debtor, but the term does not include . . . [p]roperty to the extent it is generally exempt under nonbankruptcy law[.]" *Id.* § 15-3-101(b). Proceeds of life insurance policies fall under that exemption. *Id.* § 85-3-11(1) ("All proceeds of a life insurance policy including cash surrender and loan values, shall inure to the party or parties named as beneficiaries thereof, free from all liability for the debtors of the person whose life was insured, even though such person paid the premium thereon."); *Sec. & Exch. Comm'n v. Adams*, No. 3:18-CV-252, 2018 WL 9437320, at *2 (S.D. Miss. Dec. 21, 2018) ("Mississippi law exempts . . . certain life insurance proceeds from . . . collection by judgment creditors"); *see also Anderson v. Hillburn*, Civ. No. 19-05 GBW/SMV, 2019 WL 1779341, at *3 (D.N.M. Apr. 23, 2019) (finding life insurance policy was exempt property).

The Court cannot overlook these meaningful definitional discrepancies. The Court finds that LaShonda's UFTA claim fails because she is not a "creditor," Aaron was not a "debtor" and there has been no applicable "transfer" given the Policy's proceeds are not considered an "asset" under the Act. As such, LaShonda has not shown that the change of beneficiary was a fraudulent transfer. The Court denies LaShonda's motion for summary judgment on her UFTA claim.

**C. Constructive Trust**

The undisputed facts do not show a constructive trust claim at summary judgment either. Nor is there any fact question that allows LaShonda's claim to proceed. Under Mississippi law:[8]

> A constructive trust is one that arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.

*Cole v. Chevron USA, Inc.*, 554 F. Supp. 2d 655, 671-71 (S.D. Miss. 2007) (quoting *Union Nat'l Life Ins. Co. v. Crosby*, 870 So. 2d 1175, 1179 n.1 (Miss. 2004)). For a court to create a constructive trust under Mississippi law, the facts must show "substantial overreaching or fraud," and the proof must be clear and convincing. *Mosley v. GEICO Ins. Co.*, No. 3:13CV161-LG-JCG, 2014 WL 7882149, at *7 (S.D. Miss. Dec. 16, 2014) (citing *McNeil v. Hester*, 753 So. 2d 1057, 1064 (Miss. 2000)). And "[i]t is necessary only to establish such conduct and bad faith as would shock the conscience of the court." *Id.* at *7 (citing *Griffin v. Armana*, 687 So. 2d 1188, 1195 (Miss. 1996)).

"It is the relationship plus the abuse of confidence imposed that authorizes a court of equity to construct a trust for the benefit of the party whose confidence has been abused."[9] *Griffin*, 687

---

[8] As discussed above, if Louisiana law applies, LaShonda's constructive trust claim falters from the gate. Indeed, Louisiana does not recognize constructive trusts. *See, e.g.*, *Succession of Gaston v. Koontz*, 49 So. 3d 1054, 1058 (La. App. 2010) ("While many other states recognize constructive trusts, Louisiana does not."); *Marple v. Kurzweg*, 902 F.2d 397, 399 (5th Cir. 1990) ("Indeed, the 'constructive trust' is not recognized in Louisiana."); *Zaveri*, 27 F. Supp. 3d at 707.

[9] LaShonda's request for a constructive trust fails to plead that Aaron and her had a confidential relationship at the time of the change in beneficiaries. A confidential relationship under Mississippi law is "a relationship between two people in which one person is in a position to exercise dominant influence upon the other because of the latter's dependency upon the former, arising either from weakness of the mind or body, or through trust." *Great Am. Life Ins. Co. v. Tanner*, 766 F. App'x 82, 87-88 (5th Cir. 2019). "The Mississippi Supreme Court has generally required that a confidential relationship be present and abuse of that confidence in order to impose a constructive trust." *Eisenberg v. Grand Bank for Sav., FSB*, 207 F. Supp. 2d 553, 557 (S.D. Miss. 2002), *aff'd*, 70 F. App'x 765 (5th Cir. 2003); *but see Joel v. Joel*, 43 So. 3d 424, 431 (Miss. 2010) ("While a confidential relationship is sometimes required, sometimes it is not."). But "there is no requirement that a confidential relationship be established for a constructive trust to be

So. 2d at 1195 (citing *Summer v. Summer,* 224 Miss. 273, 80 So. 2d 35 (1955)). "An abuse of confidence within the rule may be an abuse of either a technical fiduciary relationship or of an informal relationship where one person trusts in and relies upon another, whether the relation is moral, social, domestic, or merely personal." *Id.* "The origin of the confidence reposed is immaterial." *Id.* "A confidential relationship within the rule need involve neither a promise for the benefit of another nor an express fiduciary relationship." *Id.* (citing 76 Am.Jur.2d *Trusts* §§ 201, 205-212 (1992)). "Generally, a constructive trust will be raised where, at the time the promise is made, the grantee does not intend to perform it, or it is intentionally false, or where confidential relationships exist between the parties and there is no other consideration for the conveyance except the promise, or where the promise is the inducing cause of the conveyance, no other consideration being given, and is relied on by the grantor." *Griffin*, 687 So. 2d at 1195.

The evidence LaShonda relies on at this stage fails to shock the Court's consciousness. Constructive trusts are meant to prevent "unjust enrichments." *Allgood v. Allgood*, 473 So. 2d 416, 421 (Miss. 1985). Jerry would be somewhat "enriched" if awarded the life insurance proceeds, even when considering he had been paying the Policy's premiums for years. But the crux of the matter is whether that enrichment was "unjust." The record shows that it was not.

Contractually, Aaron did what he was allowed to do under the terms of the Policy. LaShonda was not named as an irrevocable beneficiary, and the Policy provided that Aaron could change the beneficiary at any time. *See* [50-5], p. 11; [103-1], p. 6. While the Final Judgment of Divorce spoke to Aaron maintaining this Policy or another insurance policy if Aaron allowed the

imposed based on the catch-all of being 'against equity and good conscience.'" *Williams v. Williams*, 388 So. 3d 616, 625 (Miss. Ct. App. 2024) (citing *Joel*, 43 So. 3d at 431 (Miss. 2010)). Here, the Court need not explore whether a confidential relationship was required to be pled in this case because even if it were, the claim fails.

Policy to lapse,[10] Aaron was the rightful owner of the policy *at the time the transfer was made* and could change beneficiaries of that Policy as he saw fit. [48-9]; *see, e.g., Oregon Pac. State Ins. Co. v. Jackson*, 162 Or. App. 654, 658, 986 P.2d 650, 652 (1999) (denying constructive trust where judgment obligating decedent to maintain life insurance coverage was entered *after* change of beneficiary occurred); *see also Smith v. Hinton*, 365 So. 2d 963, 965 (Miss. 1978) (finding decedent's wife, who was beneficiary to an insurance policy that her husband said was hers, did not have a vested right to or an equitable lien on the policy's proceeds following decedent's change of beneficiary and subsequent death, even where wife had paid some of said policy's premiums).[11]

The fact that the Chancery Court proceedings commenced before the change of beneficiary occurred does not upset this conclusion. LaShonda's initial complaint never mentioned the Policy but did mention that Aaron "ha[d] been sentenced to the penitentiary," and "habitual[ly] and excessive[ly] use[d] opium, morphine or other like drug[s]" so much so that he "let[ ] his business go and the only real serious business he now indulges in is the habitual and excessive use of" those drugs. [38-3], ¶¶ 6-7. Her amended complaint alleged the same. [38-8], ¶¶ 6-7. The change of

[10] It is a little unclear as to whether the Final Judgment of Divorce speaks to the existing Policy or an imagined new policy Aaron had yet to procure. [38-21], ¶¶ 17, 20. Paragraph 17 says Aaron must name LaShonda as "the owner and beneficiary of" the couple's existing Policy, and he "shall be required to keep [the] policy in full force and effect upon his life." *Id.* at ¶ 17. If Aaron allowed the Policy "to lapse, he shall immediately obtain other life insurance coverage of the same like and coverage in an amount of $500,000[,]" naming LaShonda as "owner and sole beneficiary of said policy." *Id.* But paragraph 20 imagines that Aaron "procure a life insurance policy . . . in the amount of $500,000," and name LaShonda "as the owner and beneficiary of" that new policy. *Id.* at ¶ 20. Given Aaron arguably let the policy lapse when Jerry took on paying its premiums, paragraph 17 says Aaron had to get a new policy. If paragraph 20 is believed, Aaron had to do so from the outset. Either paragraph potentially indicates the Final Judgment may not reach the Policy proceeds at issue in this matter, and instead affect the proceeds of a policy Aaron never procured.

[11] This case is distinguishable from other decisions that have found that a constructive trust was appropriate when a divorce judgment instructs a party not to change life insurance beneficiaries—and that party does so *after* that judgment is entered. *See, e.g., Aetna Life Ins. Co. v. Hager*, 930 F. Supp. 343, 348 (E.D. Wis. 1996). Here, the life insurance beneficiary was changed *before* any divorce judgment was entered barring that change, the divorce court found it lacked personal jurisdiction over Aaron at the time the change was made, and there is ample evidence that the relevant party was in jail at the time the judgment was entered.

beneficiaries happened *after* Aaron had moved to be dismissed from the divorce proceedings for want of personal jurisdiction. [38-6], ¶ 5. And even after LaShonda filed an amended petition, LaShonda never mentions the Policy in her amended petition either. [38-8]. More glaringly, nothing LaShonda offers at summary judgment shows that Aaron or Jerry actually knew about the terms of the Final Judgment of Divorce prior to Aaron's death.

As to Aaron, the parties agree that after his attorney died, he went unrepresented in the Chancery Court proceedings. [118-4], p. 1. From that point forward, there is no indication Aaron had any idea about the status of his case. Aaron was ordered to "retain an attorney or to represent himself[.]" *Id.*; [38-13], [38-15]. "No attorney made any appearance on his behalf." *Id.* Aaron did not respond to discovery, despite the Chancery Court compelling him to do so. [38-9]; [38-10]; [38-11]; [38-12]; [38-16]. Aaron did not attend a status conference regarding his case, nor his own trial. [38-15]; [38-16]. Jerry's initial petition to set aside the Final Judgment of Divorce, filed *after* Aaron's death, explains why: Aaron was in rehab for three months and was confined to a Louisiana parish jail after getting out of rehab. [118-4], p. 2.[12] None of these circumstances establish Aaron's knowledge of the Final Judgment of Divorce, and they certainly do not show that he knew about any requirement related to life insurance.

The same can be said for Jerry. Viewing the record in the light most favorable to LaShonda, the only evidence that LaShonda puts forward is that Jerry sent a letter to the Chancery Court informing that court that Aaron would not be able to attend his divorce trial. The May 14, 2021 letter reads in full:

> Aaron Jerry Lee Cox was in rehab for almost 3 months, and has been incarcerated in the Washington Parish jail since leaving rehab. I'm sorry, he is unable to attend.

---

[12] LaShonda's own affidavit indicates this was par for the course during the couple's marriage, given Aaron "became addicted to drugs and was placed in the penitentiary on numerous occasions." [101-18], ¶ 9.

Jerry W. Cox
Aaron's father

[38-18]. But the language of Jerry's letter does not indicate that he is aware that the Final Judgment had been entered. Jerry writes that Aaron "*is* unable to attend" in the present tense, indicating that he believed Aaron's trial was forthcoming, not that the trial had already occurred. *Id.* (emphasis added). The scanned receipt of certified mail that accompanies the letter does not either. Even if LaShonda could establish that a certified mail receipt was for the transmission of the Final Judgment of Divorce, Jerry signing for mail on Aaron's behalf is not enough to show that Jerry, upon receipt, then opened the correspondence that was sent to Aaron. Absent authorization from Aaron, doing so could be a federal crime. 18 U.S.C. § 1702. In sum, neither the receipt nor Jerry's single letter informing the Chancery Court that his son had been incarcerated while the Chancery Court's proceedings were pending supports an inference that Jerry and Aaron had direct knowledge of the life insurance provision in the Final Judgment or that they concocted a scheme to conceal the change in beneficiaries from LaShonda.

Neither shows Jerry otherwise aided or abetted Aaron in circumventing that Final Judgment of Divorce after it was entered either. There is no indication that Jerry knew, or should have known, that the Final Judgment of Divorce even existed. After all, Jerry continued to pay the Policy's premiums since the couple's separation years before, and even after the Final Judgment of Divorce was entered. [111], p. 2; [111-2], pps. 2-8. Not only does this weaken LaShonda's argument that awarding Jerry the Policy's proceeds is "unjust," but when considering this protracted litigation across state and federal court, it stands to reason that Jerry would not continue to pay the Policy's proceeds if he had known that LaShonda was now the owner and primary

beneficiary of its proceeds. Thus, there was no indication Jerry knew his son was required to change the beneficiaries of the Policy from him and his wife, back to LaShonda.

The Court notes that Jerry was never deposed in this action by LaShonda. Again, LaShonda's divorce complaints allege that Aaron was a habitual drug user who allegedly subjected LaShonda to verbal and physical abuse during their marriage. [38-3], ¶¶ 4, 6-7; [38-8], ¶¶ 4, 6-7. But LaShonda points out in her own affidavit that she has a number of issues as well, including a serious car accident in 2009 that did not render her disabled, but has influenced her decision to cease working since. [101], p. 4. LaShonda's affidavit further states that she has had serious medical issues since that car accident, remains unable to work, is supported by her parents, has eleven different medical conditions, and is taking eight different medications. [101-18], pps. 2-3. By contrast, Jerry is a Reverend that had the financial means to support and pay for the Policy while Aaron was struggling with his drug addiction. Viewing the record as a whole, Aaron's decision to substitute LaShonda with Jerry as the primary beneficiary could have easily been a calculated decision by Aaron to ensure that the proceeds of the Policy were used by a family member he trusted in order to support his children or otherwise.

At bottom, when confronted with the reality that "[n]o rule of law is more firmly established in [Mississippi] than the one which requires that a constructive or resulting trust must be established by clear and convincing evidence[,]" *Shumpert*, 332 So. 2d at 412, the Court is unconvinced LaShonda has established Aaron's selection of his father Jerry as a beneficiary necessitates creation of a constructive trust.

## IV. CONCLUSION

The Court shall issue the death benefit proceeds of the Policy to Jerry Cox.

IT IS THEREFORE ORDERED AND ADJUDGED that LaShonda Cox's Motion for Summary Judgment [100] is DENIED. LaShonda Cox's claims against Jerry Cox are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED AND ADJUDGED that Jerry Cox's Motion for Summary Judgment [102] is GRANTED.

This, the 30th day of September, 2026.

**TAYLOR B. McNEEL**
**UNITED STATES DISTRICT JUDGE**